UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

# 03 ⎯ 12205 RCL ⫩

ROBERT COOPERSMITH and ALLEN
ECKERT, Individually and on Behalf of all
Others Similarly Situated,    MAGISTRATE JU~~~ *Neias*

Plaintiffs,

vs.

LEHMAN BROTHERS INC.,

Defendant.

*51625*

JURY TRIAL DEMANDED  150
SUMMONS ISSUED  yes
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY CLK  E.O.M
19/10/03

## COMPLAINT

Plaintiffs, through their attorneys, allege the following upon information and belief, except as to the allegations which pertain to the plaintiffs and their counsel, which are alleged upon personal knowledge. Plaintiffs' information and belief are based, *inter alia*, on the investigation made by and through their attorneys.

## NATURE OF ACTION

1.      This is a federal securities class action which is brought by the plaintiffs against Defendant Lehman Brothers Inc. ("Lehman") on behalf of all person or entities who purchased the common stock of Razorfish, Inc. ("Razorfish") during the period from May 24, 1999 through at least February 5, 2001 (the "Class Period"). Plaintiffs seek to recover damages caused to the Class by defendant's violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act.

2.      This action arises as a result of the issuance by the defendant of false and misleading analyst reports recommending that investors purchase Razorfish stock. When

issuing those reports, defendant failed to disclose significant, material conflicts of interest with respect to links between such positive recommendations and Lehman's obtaining and retaining investment banking business from Razorfish.

3.    As a result of defendant's misconduct, alleged herein, plaintiffs and the Class members have suffered substantial damages.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa], and 28 U.S.C. §§1331 and 1337.

5.    This action arises under and pursuant to Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5] and Section 20(a) of the Exchange Act [15 U.S.C.S. §78t(a)].

6.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts complained of herein occurred in substantial part in this District.

7.    In connection with the acts alleged in this Complaint, defendant, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephonic communications and the facilities of the NASDAQ National Market System, a national securities exchange.

## PARTIES

8.    Plaintiff Robert Coopersmith purchased shares of Razorfish stock during the Class Period, as set forth in the attached certification, and was damaged thereby.

2

9.    Plaintiff Allen Eckert purchased shares of Razorfish stock during the Class Period, as set forth in the attached certification, and was damaged thereby.

10.    Defendant Lehman Brothers Inc. ("Lehman") is a broker-dealer, which has been registered with the Securities and Exchange Commission ("SEC") pursuant to Section 15 of the Exchange Act, 15 U.S.C. § 78o, since March 1965. Lehman is a member of all principal securities and commodity exchanges, including NYSE, as well as NASD. Lehman's principal offices are located at 745 Seventh Avenue, New York, New York. Lehman provides the full range of services offered by a multi-purpose investment bank, including equity and fixed income sales, trading and research, investment banking, private equity and private client sales. Lehman is a wholly owned subsidiary of Lehman Brothers Holdings Inc., a Delaware corporation.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

11.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons or entities who purchased shares of Razorfish during the Class Period and who were damaged thereby. Excluded from the Class are defendant; any director, officer, parent, subsidiary, or affiliate of Lehman; any entity in which any excluded person has a controlling interest; and their legal representatives, heirs, successors and assigns.

12.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are thousands of members of the Class located throughout the United States. Throughout the Class Period, shares of the common stock of Razorfish were actively traded in an efficient market on the NASDAQ National Market System. Record owners and other members of the Class may be identified from records maintained by Razorfish and/or its transfer agents and

3

may be notified of the pendency of this action by mail and publication, using forms of notice similar to those customarily used in securities class actions.

13.    Plaintiffs' claims are typical of the claims of other members of the Class as all members of the Class were similarly affected by defendant's wrongful conduct in violation of federal law that is complained of herein.

14.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

15.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by defendant's acts and omissions as alleged herein;

(b)    Whether defendant participated in and pursued the illegal course of conduct complained of herein;

(c)    Whether statements disseminated to the investing public during the Class Period made misrepresentations or omissions of material information as alleged herein;

(d)    Whether the market price of the common stock of Razorfish was artificially inflated due to the material misrepresentations and omissions complained of herein;

(e)    To what extent the members of the Class have sustained damages and the proper measure of damages.

16.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. As the

4

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigations make it impossible for members of the Class individually to seek redress for the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## SUBSTANTIVE ALLEGATIONS

17.    On April 28, 2003, the Securities and Exchange Commission ("SEC") filed a complaint against Lehman in the United States District Court for the Southern District of New York which alleged, among other things, that Lehman violated rules of the National Association of Securities Dealers ("NASD") and the New York Stock Exchange ("NYSE") by issuing analyst reports on Razorfish that were not issued in good faith, that contained exaggerated or unwarranted claims, and/or contained opinions for which there was no reasonable basis. Based on its investigation, including, among other things, interviewing employees and reviewing Lehman's internal documents, the SEC concluded that

> Lehman used research to obtain investment banking business from covered companies. Specifically, Lehman tied the financial compensation of analysts directly and indirectly to the analyst's success in generating investment banking revenue from covered companies. In addition, Lehman also used the promise of future research coverage to obtain valuable IPO ["initial public offering"] underwriting business and marketed to companies the ability of Lehman analysts to move the market for a stock. Lehman analysts were subject to conflicts of interest that, at times, adversely impacted the independence of Lehman's research product.

18.    The SEC further concluded that

> In certain instances, the financial incentives and pressure on analysts to assist in obtaining investment banking deals and to maintain banking relationships adversely affected the integrity of the analysts' ratings, price targets, and research reports, and caused analysts to issue more positive reports or ratings, and to avoid downgrades or negative reports regarding companies that were investment banking clients.

19.    The internal documents produced to the SEC by Lehman, including those referred to in the SEC Complaint, bear litigation identification numbers with the prefix "LEH."

Such documents which are referred to or quoted herein are referenced by their litigation identification number.

## CONFLICTS OF INTEREST ARISING FROM LEHMAN'S USE OF RESEARCH COVERAGE TO OBTAIN INVESTMENT BANKING BUSINESS

### Lehman's Research Analyst Coverage

20.     Research analysts collect and analyze financial and other information about a company and its industry and develop ratings and recommendations regarding its securities. As alleged in the SEC Complaint, "Lehman analysts also evaluate a company's expected earnings, revenue and cash flow, operating and financial strengths and weaknesses, and long term viability and dividend potential." Defendant's analysts then issue written research materials including reports and First Call notes regarding certain companies and industry sectors Lehman covers.

21.     As alleged in the SEC Complaint, during the Class Period, Lehman's research was distributed to institutional clients and retail investors through its own brokers as well as Fidelity Investments, with which Lehman had entered into a "strategic alliance" in June 1999. Lehman also sold its research to other broker-dealers who provided the research to their clients and made its research available to the investing public through services such as Thomson Financial/First Call and Multex.com, Inc. In addition, Lehman's analysts ratings were publicly available to investors through a number of media outlets.

22.     During the Class Period, Lehman analysts assigned a "rank" to each stock according to a 5-point scale purporting to reflect how the analyst believed the stock would perform relative to the market generally, which would appear at the top of the first page of the respective research report. As alleged in the SEC Complaint, from at least June 1999 through December 2000, Lehman used the following ratings:

1-Buy (expected to outperform the market by 15 or more percentage points)

2-Outperform (expected to outperform the market by 5-15 percentage points)

3-Neutral (expected to perform in line with the market, plus or minus 5 percentage points)

4-Underperform (expected to underperform the market by 5-15 percentage points)

5-Sell (expected to underperform the market by 15 or more percentage points).

23.    As alleged in the SEC Complaint, after January 2001, Lehman retained its 5-point scale but changed the names of these ratings to "1-Strong Buy", "2-Buy", "3-Market Perform", "4-Market Underperform", and "5-Sell". The definitions remained the same.

24.    As alleged in the SEC Complaint, the definitions of the above ratings were provided to Lehman clients on a monthly basis and, beginning in March 2001, appeared on all of Lehman's research reports.

25.    During the Class Period, although Lehman represented that it used a 5-point ratings scale to rank securities, Lehman analysts never assigned a 5-Sell rating to a U.S company and almost never assigned a 4-Underperform rating to a stock.

26.    As alleged in the SEC Complaint, Lehman's analysts also assigned a stock price target which purportedly reflected the price at which the analyst believed the stock would trade within a period of time that was identified in some research reports and not in others. Beginning in March 2001, the relevant time period appeared in all of Lehman's research reports.

## Lehman Used Its Research To Obtain Investment Banking Business

27.    As alleged in the SEC Complaint, from at least July 1999 through June 2001, Lehman competed with other investment banking firms to be selected lead manager for initial public offerings of securities. Lehman earned fees as a manager and  hoped that these offerings would lead to ongoing transactional and advisory work from both existing and

prospective clients, including secondary offerings and financial advisory arrangements. In 2001 alone, Lehman served as lead manager for 66 equity deals and earned approximately $1.3 billion from providing underwriting services to its clients.

28.    Lehman's analysts worked closely with investment bankers to generate business for the firm. As alleged in the SEC Complaint, analysts worked with investment bankers

> to identify corporate finance opportunities and to win corporate finance business for Lehman, including identifying private companies appropriate for an IPO as well as identifying possible transactions, such as secondary offerings or debt financings, once a company had completed an IPO. To this end, analysts were expected to have yearly target and alignment meetings with the Investment Banking counterparts.

29.    In an August 5, 1999 memorandum (the "August 5 Memo"), Lehman's Managing Director of Global Equity Research stated that Investment Banking and Research "should work together to increase Lehman's number of" stock offerings. The August 5 Memo also stated that "the analyst is THE key driver of the firm relationship with its corporate client base. Analysts need to accept responsibility and use it to expand the franchise and drive profitability . . . ." The memo also told analysts "global research must drive the banking targeting efforts" and that "to enure we have proper recognition of analysts' impact on banking, we have to closely track every dollar of [Banking] revenue (equity, M&A, and debt) by analyst."

30.    Another memorandum directed to analysts by the Managing Director of Global Equity Research, dated September 14, 1999 (the "September 14 Memo"), emphasized the importance of the "Banking/Research Partnership." The September 14 memo and the materials attached to it stated that this partnership was "critical to the success of the firm" and would "accelerate growth", "strengthen[] brand perception", and "increase[] origination fee share" for Lehman (LEH-E 00619555, 00619559) The September 14 memo advised analysts that for the Banking/Research Partnership to be successful, analysts would have to "[s]upport Banking revenue requirements." (LEH-E 00619555) The memo also described

the mission of the "partnership" between Lehman's Research and Investment Banking departments as including to "[c]reate a structure between Research and Banking that aggressively supports client relationship development, revenue growth and [return on equity]"; and "[a]ccelerate[s] and enhance[s] [Lehman's] growth initiative." (LEH-E 00619556)

31.    The September 14 Memo also stated that analyst compensation would be "impacted by contribution to banking" and "reviewed with appropriate banking group heads." (LEH-E 00619587)

32.    Research analysts were advised that they would be evaluated on, among other things, the extent to which the analyst "[p]laces origination as [a] priority" and "adds value in building banking business," and the analyst's "effectiveness in [the] pitching process." (LEH-E 00619585)

33.    Thus, investment banking considerations had a major impact on analyst compensation.  As alleged by the SEC:

> "Lehman analysts typically received relatively small base salaries and considerably larger bonuses. Bonuses were determined by, among other factors, the amount of Investment Banking revenue generated by companies the analysts covered. The bonuses Lehman paid to analysts dwarfed their base salaries and gave the analysts a strong personal financial incentive to obtain Investment Banking business. This compensation structure . . . created conflicts of interest."

34.    The SEC complaint also alleges that Lehman used its research coverage to obtain Investment Banking business.

> Lehman used the promise of future research coverage to obtain Investment Banking business. Implicit in Lehman's marketing efforts was the assurance that Lehman's research would be favorable and **that Lehman's research would raise the price of the issuer's stock.**"  (Emphasis added)

35.    For example, in a March 8, 2000 email, a research analyst explained that he was initiating coverage on a company because "there is a potential banking deal (big $$$)

we're trying to get into later this year. The bankers just want the report out. They don't care about promoting the stock and realize it is of little interest to my client base." (LEH-E 01221246)

36.    As yet another example, an investment representative told an analyst that two of his clients who were principals of a publicly traded company, Student Advantage, had asked to speak with a Lehman research analyst regarding coverage of their company. In a February 16, 2000 email, the analyst responded that "the proper process is to introduce the principals to someone in investment banking, if we have the resources and there appears to be significant revenue potential, banking will request research." (LEH-E 02114722)

## Lehman Consented to Entry of Judgment on the SEC Complaint

37.    Lehman consented to entry of judgment on the SEC complaint against Lehman, without admitting or denying guilt. A judgment was entered against Lehman that, *inter alia*:

(a) permanently restrained and enjoined Lehman from violating Rule 2110 of the Conduct Rules of NASD Inc. ("NASD") and Rules 401 and 476 of the New York Stock Exchange, Inc. ("NYSE"), by: (1) engaging in acts or practices that create or maintain inappropriate influence by investment banking over research analysts and therefore impose conflicts of interest on research analysts, and by failing to manage these conflicts in an adequate or appropriate manner; (2) publishing research reports that do not provide a sound basis for evaluating facts, are not properly balanced, and/or contain exaggerated or unwarranted claims and/or opinions for which there is no reasonable basis; (3) promising, implicitly or explicitly, favorable research coverage to investment banking clients or potential clients; and

(b) ordered Lehman to pay $80,000,000, of which $25,000,000 was a penalty, $25,000,000 was disgorgement of commissions and other monies, $25,000,000

is to be used for the procurement of Independent Research, and $5,000,000 is to be used for investor education.

## FALSE AND MISLEADING STATEMENTS REGARDING RAZORFISH

38.    Razorfish was at all relevant times a strategic digital communications company that provides Digital Change Management (sm) strategy, design, and technology services to leading companies and organizations around the world.  In general terms, Razorfish was a so-called "new economy" company that provided internet related services to businesses.  The company is headquartered in New York, New York and has offices in Boston, Massachusetts and elsewhere.  Razorfish is not a defendant in this action.  On March 3, 2003, Razorfish was acquired by SBI and Company.

39.    Lehman was the co-manager of Razorfish's IPO of stock on April 27, 1999, in which Razorfish sold stock at $16 per share.  On the first day of trading, Razorfish shares opened at $56 per share and ended the day at $35 per share, well above the IPO price.

40.    On May 24, 1999, Lehman initiated analyst coverage of Razorfish with a report that rated Razorfish a "2-Buy" rating at a price target of $48 per share.  The price target was some 33% above the price at which Razorfish was trading.

41.    This report was false and misleading in that it did not reflect the good faith belief of the Lehman analyst who prepared the report, and it did not disclose that the report was influenced by conflicts of interest in that (a) Lehman used research coverage to generate profitable investment banking business, and (b) analysts' compensation was based in part on contributions to investment banking revenue.

42.    As alleged in the SEC Complaint, on May 3, 1999, the Lehman analyst covering Razorfish "confided to an institutional investor in e-mails that he was not sure of the rating and price to assign to [Razorfish] when he initiated coverage."  The institutional

investor replied to the analyst that he would rate Razorfish neutral with a price target of $20. The Lehman analyst responded:

> "Well, they are a banking client, so I expect a 2 rating with a price target just a shade above the trading price."  (LEH-E 00921735)

43.    The analyst explained this rating and price target in an e-mail to the institutional investor which stated as follows:

> "well ratings and price targets are fairly meaningless anyway, buy-side generally ignores, commentary is what matters and I'll be a 3-Neutral in my comments . . . but, yes, **the 'little guy' who isn't smart about the nuances may get misled, such is the nature of my business."** (Emphasis added). (LEH-E 00921735)

In short, the analyst was acknowledging that the "little guy", or retail investor, might be misled by his report on Razorfish.

44.    The May 24, 1999 report on Razorfish was false and misleading because it was not issued in good faith, it did not reflect the true beliefs of the analyst, and it was influenced by investment banking considerations, none of which was disclosed to the public.

45.    As alleged in the SEC complaint, the report on Razorfish was not based on good faith, it did not provide a sound basis for evaluating facts, it contained exaggerated or unwarranted claims, and/or it contained opinions for which there was no reasonable basis.

46.    The analyst report on Razorfish was the product of a system that was dominated by conflicts of interest between research and investment banking considerations.

47.    As alleged in the SEC complaint,

> "Lehman held out its research analysts as providing independent recommendations and analysis of companies and stocks upon which investors could rely in reaching investment decisions.  Lehman promoted its research for the 'quality and timeliness of its investment recommendations.'
>
> In fact, Lehman's research analysts were, at times, subjected to conflicts of interest arising from the close relationship between Research and Investment Banking.  Such conflicts of interest, at times, adversely impacted the independence of Lehman's public stock recommendations."

48.    These conflicts of interest were institutionalized at Lehman.  With respect to the Razorfish reports, the SEC alleged that the May 24, 1999 report cited above was an example that demonstrated that

> "These conflicts of interest caused analysts, at times, to issue more positive research reports or ratings, and to avoid downgrades or negative reports regarding companies that were Investment Banking clients."

49.    For example, on March 15, 2000, a Lehman investment banker sent an email to the supervisor of a senior analyst named Dan Fletcher, praising Fletcher for his "recent helpfulness in a touchy situation with RSL Communication," for which Lehman had led an IPO.  The March 15, 2000 email states:

> Following RSL's recent convertible notes issue (for which we were a co), Dan [Fletcher] was inclined negatively toward the Company's prospects; however, he agreed to hold off on a downgrade (which would have harmed an important banking relationship) at the request of banking until he could hear out management.
>
> Dan met with the Company's CEO and was convinced positively, he issued a positive report and was the axe behind significant positive momentum to the stock.  The CEO ... has indicated we will be included in the underwritings of their coming spin-offs.  Thus, Dan has helped our banking relationship with the client significantly.  (LEH-E 00670968)

50.    On January 24, 2001, a Lehman investment banker sent an email to the same research analyst (Daniel Fletcher) regarding a research report on a Lehman

investment banking client, asking whether there was "any chance of nudging up that price target?" Fletcher responded "Isn't it better for your cause to start conservative, and move up targets, rather than start high and use up dry powder?" The investment banker responded "yes–but if they are doing a financing and a few points on a price target puts us in line with our competition and, hopefully, helps us get into a financing, it may be worth considering–I don't envy your job (or mine, for that matter), but unfortunately this is the way of the world these days." Fletcher wrote back an email stating "I'm already at $40, I can add a buck or two." The investment banker responded almost immediately with an email stating "that would be great," to which Fletcher replied "Done." (LEH-E 00980812)

51.    In addition, on March 20, 2001, another Lehman research analyst sent an email to the firm's investment bankers advising them that the research analysts were still working on price targets for certain stocks. The research analyst informed the bankers that certain stocks were "trading better than our calculated price target based on the group metrics" but assured them that "We have no intention of having any price targets below the current trading levels and **we will come up with exceptions in these cases.**" (Emphasis added).  (LEH-E 00661732)

52.    Moreover, the Lehman analysts who authored the reports on Razorfish during the Class Period curried favor with Razorfish by regularly e-mailing information to Razorfish executives. For example, on May 16, 2000 the Lehman analysts e-mailed to Razorfish executives a new spreadsheet they had prepared of key operating metrics for the first quarter of 2000 and the fourth quarter of 1999 on companies in the ebusiness services sector. The analysts also sent Razorfish executives copies of research reports prepared by Lehman on competitors of Razorfish and reports on the IT professional services sector.

53.    The May 24, 1999 Lehman report on Razorfish was followed by subsequent favorable reports with price targets far above the then trading price for Razorfish stock.

14

54.    On September 20, 1999, before the market opened, Lehman issued an analyst report upgrading Razorfish from an "outperform" to a "buy" with a 12-month stock price target of $48, well above the previous day's closing price of $30.875. Lehman maintained its buy rating until October 2000.

55.    On October 20, 1999, Lehman issued an analyst report on Razorfish reiterating its "buy" rating and raising its 12-month stock price target from $48.00 to $75.00 a share, well above the previous day's closing price of $51.875.

56.    On November 9, 1999, Lehman issued an analyst report on Razorfish reiterating its "buy" rating with a 12-month stock price target of $85.00 per share.

57.    The closing price of Razorfish stock reached a high of $101.50 per share prior to a 2-for-1 stock split on January 20, 2000. Beginning in mid-February 2000, Razorfish's stock price began a steady decline that lasted throughout the Spring of 2000 and beyond. Nevertheless, Lehman continued to issue analyst reports with stock price targets well above Razorfish's market price.

58.    For example, on March 16, 2000, Lehman issued a report on Razorfish reiterating its "buy" rating with a price target of $60 per share. The price target was almost twice the then market price of approximately $32 per share.

59.    Similarly, on May 26, 2000, Lehman issued a report on Razorfish with the rating "1-Buy" and a price target of $40 per share, which was approximately triple the then trading price of $13.50 per share. Lehman set this aggressive price target notwithstanding that it acknowledged in the report that Razorfish was trading at a price 45 times its expected earnings per share for 2000.

60.    Lehman maintained its "1-Buy" rating and price target of $40 per share in reports issued on July 6 and July 26, 2000.

61.    In a report dated October 6, 2000, Lehman reduced its "1-Buy" rating to "2-Outperform" after Razorfish had pre-announced that its third quarter revenue would not meet expectations.  Lehman rated Razorfish "Outperform" and set a price target of $12 per share, approximately 50% above the then trading price for Razorfish stock, notwithstanding that Lehman was lowering its estimate for 2001 revenues for Razorfish from $458 million  to $377 million.

62.    In another report dated October 25, 2000, issued after Razorfish reported its third quarter 2000 results which were in line with the pre-announcement, Lehman maintained its "2-Outperform" rating and set a price target of $10 per share, or approximately 100% above the then trading price of $5 5/16.

63.    Consistent with the analyst's statement quoted above that he would be less bullish in his commentary than in his ratings and price targets, even though "the little guy who isn't smart about the nuances may get misled", the Lehman report of October 25, 2000 had an "Outperform" rating and bullish price target, while the commentary stated "we believe that Razorfish shares are fairly valued."

64.    In a report dated December 13, 2000, Lehman maintained the "2-Outperform" rating for Razorfish with a price target of $5 per share, which was approximately 67% above the then trading price of $3.09 per share.  Lehman rated Razorfish "Outperform", notwithstanding that the previous day Razorfish had pre-announced fourth quarter 2000 revenues of approximately 1/3 below Lehman's estimates and a cash EPS loss of 17-20 cents, as contrasted with Lehman's estimated EPS of $.02 per share.

65.    Lehman's reports containing analysts' ratings and stock price targets, which were available to the investing public through various media outlets, had a dramatic effect on Razorfish's stock price.

66.    For example, on September 20, 1999, at 8:05 a.m., Bloomberg Data reported that Lehman's analyst Karl Keirstead had raised Razorfish's rating from an "outperform" to a "buy" with a 12-month stock price target of $48 per share.  A few hours after the announcement of the upgrade, at 11:27 a.m., Bloomberg reported Razorfish stock had risen $6-15/16, or 22 percent, to $37-13/16 and had traded as high as $39-1/4. Razorfish stock closed at $37-5/8 in heavy trading of 2.28 million shares, more than 12 times its 3-month daily average.  After the close of trading, Bloomberg reported that Razorfish's stock price rose as much as 31 percent during the day after the Lehman analyst issued the report.

67.    On October 20, 1999, Lehman issued an analyst report on Razorfish reiterating its "buy" rating and raising its 12-month stock price target from $48.00 to $75.00 a share.  Following the issuance of the report, Razorfish's stock price rose over 22 percent to close at $62.3124 on trading of over 1.5 million shares.

68.    On February 5, 2001,  Razorfish confirmed rumors that it was laying off 400 employees, over 22% of its workforce, and implementing "restrictive expense policies" involving company travel, recruiting, facilities and marketing programs, as part of a $70 million restructuring plan.  Shares of Razorfish closed at $1.81, down 16 cents or almost 8% from the previous day's closing price, and down almost 97% from the prior 52-week high of $56.94, reached on February 14, 2000.

## COUNT I

### FOR VIOLATION
### OF SECTION 10(b) OF THE EXCHANGE ACT
### AND RULE 10b-5 PROMULGATED THEREUNDER

69.    Plaintiffs repeat and reallege each and every allegation set forth above.

70.    During the Class Period, Defendant carried out a plan, scheme and course of conduct that was intended to and did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of the common stock of technology companies that were covered by Lehman's stock research team; and (iii) cause Plaintiffs and other members of the Class to purchase those companies' stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendant took the actions set forth herein.

71.    Defendant: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of Razorfish common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

72.    Defendant's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of obtaining lucrative investment banking business from Razorfish. Defendant recommended that investors buy Razorfish stock without disclosing a serious conflict of interest between Defendant's research coverage and the acquisition of investment-banking business by Lehman; and failed to disclose that such positive recommendations were linked to Lehman's desire to obtain and keep Razorfish as an investment-banking customer.

73.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of the

common stock of Razorfish was artificially inflated during the Class Period. In ignorance of the fact that the market price of Razorfish shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendant, or upon the integrity of the market, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendant but not disclosed in public statements by Defendant during the Class Period, Plaintiffs and the other members of the Class acquired Razorfish common stock during the Class Period at artificially inflated prices and were damaged thereby.

74.    At the time of said misrepresentations and omissions, plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiffs and the other members of the Class known of the omitted material facts, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired Razorfish common stock during the Class Period, or, if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

75.    Plaintiffs and the other members of the Class were injured because the risks that materialized were risks of which they were unaware as a result of Defendant's misrepresentations, omissions and other fraudulent conduct alleged herein. Absent Defendant's wrongful conduct, plaintiffs and the members of the Class would not have been injured.

76.    By virtue of the foregoing, Defendant violated Section 10(b) of the Exchange Act and Rule 10b-5 (a) (b) and (c) promulgated thereunder.

77.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Razorfish common stock during the Class Period.

## COUNT II

### FOR VIOLATION OF
### SECTION 20(a) OF THE EXCHANGE ACT

78.    Plaintiffs repeat and reallege each and every allegation set forth above.

79.    This claim is asserted against defendant Lehman pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

80.    During the entire Class Period, defendant Lehman was a "controlling person" of the analyst who prepared research reports on Razorfish, within the meaning of Section 20(a) of the Exchange Act.

81.    Defendant Lehman was a "controlling person" of the analyst because it had the influence and power over the analyst to cause, and did cause, the analyst to engage in the wrongful conduct complained of herein, and because it had the power to have prevented the analyst from engaging in the unlawful conduct alleged herein, but it purposely and intentionally did not use that power to do so.

### PRAYERS FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A.    declaring this action to be a plaintiff class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.    finding that the defendant violated Section 10(b) of the Exchange Act and Rule l0b-5 promulgated thereunder by its acts and omissions as alleged in this Complaint;

C.    awarding plaintiffs and the members of the Class damages, together with interest thereon;

D.    awarding plaintiffs and the members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

E.    awarding plaintiffs and the members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

By their attorneys,

Thomas G. Shapiro BBO #454680
Theodore M. Hess-Mahan BBO #557109
Shapiro Haber & Urmy LLP
75 State Street
Boston, MA 02109
(617) 439-3939

Robert Finkel
Wolf Popper LLP
845 Third Avenue
New York, NY 10022
(212) 759-4600

Attorneys for Plaintiffs

Dated: November 10, 2003

## PLAINTIFF'S CERTIFICATION OF
## SECURITIES FRAUD CLASS ACTION COMPLAINT

I, **Sam Allen Eckert**, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.    I have reviewed the Complaint.

2.    I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

3.    My transactions in Razorfish securities during the Class Period were as follows:

| Company | Date | Transaction | # of Shares | Price Per Share |
|---------|------|-------------|-------------|-----------------|
| Razorfish | 1/4/01 | Buy | 1,000 | 1-19/32 |

4.    I did not purchase these securities at the direction of counsel, or in order to participate in any private action arising under the Securities Act of 1933 or the Securities Exchange Act of 1934.

5.    I have neither served, nor sought to serve, as a representative party on behalf of a class in a securities fraud lawsuit during the three-year period preceding the date of signing this certification, except as follows:

6.    I will not accept any payment for serving as a representative on behalf of the Class beyond my pro rata share of any possible recovery, except for an award, as ordered or approved by the Court, for reasonable costs and expenses (including lost wages) directly relating to the representation of the Class.

Signed under the penalties of perjury this /<sup>st</sup> day of Oct., 2003.

Sam Allen Ebert
Sam Allen Ebel Trustee

## PLAINTIFF CERTIFICATION
## UNDER THE FEDERAL SECURITIES LAWS

Robert Coopersmith ("Plaintiff"), hereby states that:

1.     Plaintiff has reviewed the foregoing complaint against Lehman Bros. Inc. and has authorized the filing of that complaint.

2.     Plaintiff did not purchase the securities that are the subject of the action at the direction of counsel or in order to participate in this private action.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     During the Class Period alleged in the Complaint, Plaintiff made the following transactions in Razorfish, Inc. securities:

| Buy or Sell | Trade Date | No. of Shares | Price Per Share |
| --- | --- | --- | --- |
| Buy | 3.7.00 | 600 | $37.00 |
| Buy | 8.25.00 | 200 | $13 5/16 |

5.     Plaintiff has not served as a representative party on behalf of a class under this title during the last three years.

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class except to receive a pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses, including lost wages relating to the representation of the class.

7.     Plaintiff declares under penalty of perjury that the foregoing is true and correct.

Executed this 14 th day of October 2003.

By _____
Robert Coopersmith

Doc#: 137057 Vers:1 9730:0294